**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

**Case No. _____**

DNA COMPREHENSIVE THERAPY
SERVICES, LLC. *d/b/a* ELITE DNA
BEHAVIORAL HEALTH,

     Plaintiff,

v.

NEXTGEN HEALTHCARE, INC.,

     Defendant.

_____/

## COMPLAINT

Plaintiff, ELITE DNA COMPREHENSIVE THERAPY SERVICES, LLC. d/b/a ELITE DNA BEHAVIORAL HEALTH ("**Elite DNA**"), brings this action against Defendant, NEXTGEN HEALTHCARE, INC. ("**NextGen**"), and alleges as follows:

## INTRODUCTION

1.    This case presents a stark example of healthcare technology vendor exploitation: NextGen marketed itself as an industry leader in behavioral health electronic health record ("**EHR**") systems, secured a multi-million dollar contract based on specific promises about specialized mental health functionality, then delivered generic medical software wholly unsuitable for behavioral health practice—software so fundamentally deficient it cannot capture critical patient safety information such as suicide risk assessments and behavioral triggers.

2.    The stakes are not merely commercial. When EHR systems fail in behavioral health settings, patient safety is at risk. NextGen's defective software creates documented patient safety

risks by failing to capture and track the specialized clinical information that mental health professionals require to provide safe, effective care.

3.       Despite Elite DNA's repeated, exhaustive attempts to work with NextGen to obtain the promised functionality, NextGen has proven either unable or unwilling to deliver a system capable of meeting basic behavioral health industry standards, instead offering only excuses, delays, and demands for additional payment. Meanwhile, NextGen claims Elite DNA remains contractually bound to software that compromises patient care and cannot support clinical operations.

4.       The extent of NextGen's misrepresentation became undeniably evident during a July 9, 2025 demonstration when Wendy Coots, NextGen's own Nurse Practitioner and Senior Sales Application Specialist, could not successfully operate their software during a mock patient session with Elite DNA's clinical leadership and failed to document critical risk factors—precisely the patient safety failures that Elite DNA had warned would result from NextGen's defective system design.

## Parties

5.       Plaintiff, Elite DNA, is a Florida limited liability company with its principal place of business at 4310 Metro Parkway, Fort Myers, Florida 33916. Elite DNA operates comprehensive behavioral health services across thirty-three locations, with most in Florida and a few in Virginia, employing over 500 mental health providers serving patients with psychiatric conditions, substance abuse disorders, and related behavioral health needs through a mission focused on evidence-based treatment and comprehensive patient support systems.

6.       Defendant, NextGen, is a Delaware corporation with its principal place of business in Atlanta, Georgia. NextGen markets and sells healthcare technology solutions nationwide,

specifically representing its behavioral health EHR software suite with "Best in KLAS" recognition and positioning itself as a leading provider of specialized mental health practice management systems.

## Jurisdiction and Venue

7.     This Court possesses subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), as this civil action involves citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest and costs. Specifically, the contract at issue involves total consideration exceeding nine million dollars over a four-year term, with NextGen demanding immediate payment of over $500,000, and threatening to accelerate the rest of the amount due under the contract. Elite DNA also seeks direct damages for implementation failures and staff time costs.

8.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to these claims occurred within the Middle District of Florida. NextGen directed its marketing activities, contract negotiations, and performance obligations toward Elite DNA's principal place of business in Fort Myers and its other Florida practice locations. The contractual relationship contemplated performance within the Middle District of Florida through Elite DNA's practice locations serving Southwest Florida communities, making this District the natural and logical forum for adjudicating disputes arising from NextGen's performance failures.

9.     This Court may exercise personal jurisdiction over NextGen under Federal Rule of Civil Procedure 4(k)(1)(A) because NextGen purposefully directed activities toward Florida residents, conducted substantial business activities within Florida through contract negotiations and performance attempts, and the claims arise directly from NextGen's Florida-directed activities.

## Factual Allegations

10.      Elite DNA operates as a comprehensive behavioral health provider specializing in psychiatric treatment, therapy services, and substance abuse counseling across numerous Florida and several Virginia locations. The practice's clinical model requires sophisticated EHR capabilities specifically designed for behavioral health workflows, including real-time documentation during patient sessions, comprehensive risk assessment tracking, therapeutic progress monitoring, and seamless communication between supervising psychiatrists and clinical staff.

11.      Behavioral health practice differs fundamentally from primary care medicine in its documentation requirements. Mental health sessions involve fluid conversations where patients may spontaneously reveal critical information including trauma history, suicidal ideation, substance abuse patterns, and triggering events. The EHR system must accommodate real-time documentation without disrupting therapeutic rapport and must integrate comprehensive patient narratives that inform ongoing treatment decisions.

12.      Elite DNA's practice model includes sixty-minute initial psychiatric evaluations and twenty-minute follow-up sessions, requiring EHR systems optimized for efficiency and clinical workflow. The practice serves vulnerable populations where incomplete or delayed documentation can compromise patient safety, particularly regarding suicide risk assessment, medication management, and crisis intervention protocols.

13.      NextGen's sales team, led by Sales Representative Ashley DeMasi and Vice President of Behavioral Health Sales Nick Maynard, conducted extensive presentations emphasizing NextGen's specialized behavioral health capabilities. These presentations specifically highlighted NextGen's "Best in KLAS" recognition for healthcare IT providers and

positioned NextGen's behavioral health suite as a "gold standard" solution superior to competitors.

14.     During contract negotiations, NextGen represented that their "out of the box" behavioral health suite would provide comprehensive functionality specifically designed for mental health providers without requiring extensive customization. NextGen emphasized that this approach would enable faster implementation targeting summer 2025 go-live dates while delivering specialized behavioral health workflows immediately upon deployment.

15.     On December 23, 2024, Elite DNA and NextGen executed a comprehensive Master Agreement, establishing a four-year contractual relationship with total financial obligations exceeding nine million dollars (attached hereto as Exhibit "**A**")[1].

16.     The agreement's financial structure included recurring quarterly subscription fees of $473,146.20 and implementation services totaling $486,547.93, with additional costs for ongoing support and maintenance. The contract specifically designated the service term as "binding, non-cancelable, and irrevocable" for the initial forty-eight-month period, reflecting NextGen's representation that their system would provide consistent value throughout the entire term.

17.     NextGen's Statement of Work, incorporated within the Master Agreement, specifically committed to delivering a comprehensive behavioral health software suite including Electronic Health Records ("**EHR**"), Electronic Practice Management ("**EPM**"), and Behavioral Health ("**BH**") solutions designed for Elite DNA's multi-location practice serving over 500 providers across 33 locations.

18.     NextGen's implementation commitment specified utilization of "NextGen's

---

[1] Alhtough Plaintiff does not consider Exhibit A to contain confidential information requiring sealing, Plaintiff will file this exhibit under seal if Defendant believes it contains confidential information and requests such treatment pursuant to Local Rule 1.11.

recommended configurations for NGE standard CORE templates and workflows" specifically designed for behavioral health applications. The Statement of Work designated NextGen as responsible for project management, project documentation, risk management, and delivery of a functional system within thirty-three weeks targeting summer 2025 implementation:

| EXHIBIT A - CUSTOM REQUIREMENTS |
| --- |
| Custom requirements to the Scope Parameters & Solutions used in the herein SOW, are listed below and are accessory to the SOF. |

- Scoping based on 4-phased live dates. Initial go-live for phase 1 is targeted for June 2025 with remaining phases going live from July through September 2025. For Company to adhere to these timelines Client project manager shall be designated and communicated to Company 1 week post Effective date, and Client project team shall be designated and communicated to Company 3 weeks post Effective date.
- Utilization of NextGen Model System (NGMS) configuration for the herein implementation of NextGen Enterprise Software (NGE). NGMS is defined as utilizing Nextgen's recommended configurations for NGE standard CORE templates and workflows.

### Immediate Discovery of Fundamental System Defects

19.    Within weeks of contract execution, Elite DNA's clinical leadership began evaluating NextGen's behavioral health templates and immediately discovered fundamental deficiencies that rendered the system unsuitable for mental health practice.

20.    Dr. Reese VanCamp, Elite DNA's Vice President of Psychiatry, Margaret Barrow, Advanced Practice Registered Nurse and Regional Leader, and Dylan Demars, Psychiatric-Mental Health Nurse Practitioner and Regional Leader, conducted comprehensive reviews of NextGen's "behavioral health suite" and determined that the software exhibited characteristics of generic primary care templates rather than specialized mental health functionality.

21.    Specific deficiencies identified during initial evaluation included, but were not limited to:

(a) Trauma documentation sections populated with *physical* trauma categories such as "blunt force trauma" rather than *psychological* trauma assessments required for behavioral health practice;

(b) Absence of clinical formulation logic necessary for psychiatric diagnosis and treatment planning;

(c) Lack of therapy progress tracking capabilities essential for ongoing treatment evaluation; and

(d) Missing risk documentation features required for suicide assessment and crisis intervention protocols.

22.     Critically, the behavioral health suite's design required excessive navigation through compartmentalized dropdown menus and clicking sequences that prevented real-time documentation during patient sessions.

23.     This fundamental design flaw directly contradicted the fluid documentation requirements of behavioral health practice, where patients frequently shift topics during therapeutic conversations and providers must capture emerging clinical information without disrupting therapeutic rapport.

24.     The system lacked essential behavioral health integration features including communication pathways between therapists and supervising psychiatrists, comprehensive patient history access during follow-up visits, and adequate narrative documentation capabilities for capturing patient "stories" that inform treatment decisions in mental health practice.

## NextGen's Improper Burden-Shifting and Exploitation of Elite DNA's Staff

25.     Rather than delivering the promised "out of the box" behavioral health solution, NextGen immediately began insisting that Elite DNA's clinical staff perform extensive product development work that should have been completed before marketing the software as a specialized behavioral health system.

26.     Beginning in January 2025, NextGen required Elite DNA's regional clinical leaders

to create comprehensive "workbooks" during mandatory "build sessions" detailing basic medical diagnoses, psychiatric medications, treatment protocols, and workflow specifications that any legitimate behavioral health EHR system should have incorporated as standard functionality.

27.     Elite DNA's clinical leadership, including Dr. VanCamp, Barrow, and Demars, were forced to divert hundreds of hours from patient care responsibilities to compile spreadsheets containing readily available medical data including diagnostic codes, medication databases, and treatment protocols—work that represented unpaid product development for NextGen's deficient system.

28.     During a project meeting in early 2025, NextGen Vice President Nick Maynard explicitly acknowledged that NextGen intended to utilize the work product created by Elite DNA's clinical staff as template materials for future behavioral health client implementations, effectively transforming Elite DNA into unpaid consultants for NextGen's product development efforts.

29.     NextGen's training sessions consistently demonstrated fundamental incompetence, with NextGen staff unable to answer basic questions about their own software's functionality or complete simple demonstration workflows from start to finish. When Elite DNA's providers requested basic demonstrations showing how a behavioral health visit would proceed using NextGen's system, NextGen representatives could not provide helpful or coherent responses.

### June 12, 2025 AI Demonstration Disaster

30.     As Elite DNA's documented concerns about system inadequacy mounted throughout early 2025, NextGen scheduled a critical demonstration meeting for June 12, 2025, ostensibly to address Elite DNA's specific technical and workflow concerns.

31.     The June 12 meeting included Elite DNA's senior leadership: David Dougherty (VP Revenue-Cycle-Technology Enablement), Jason Moon (President), Elizabeth Dosoretz

(Founder and CEO), Dr. VanCamp (VP Psychiatry), Margaret Barrow (Regional Leader), and Dylan Demars (Regional Leader). NextGen was represented by Nick Maynard (VP Behavioral Health Sales), Chad Rachic (Senior Manager of Implementation), and Ashley DeMasi (Sales Representative).

32.     Rather than addressing Elite DNA's documented deficiencies in core EHR functionality, NextGen representatives attempted to deflect attention by showcasing their "Mobile Pro AI" feature as a comprehensive solution that would allegedly eliminate the need for manual documentation by automatically generating complete visit reports.

33.     NextGen conducted a live "mock visit" demonstration using their Mobile Pro AI technology, representing that the artificial intelligence system would capture comprehensive clinical information and produce detailed documentation meeting behavioral health practice standards without requiring provider input during patient sessions.

34.     The Mobile Pro AI demonstration failed catastrophically. The system produced garbled, incomplete output with fundamental errors including:

(a) chief complaints such as "neck and back pain" incorrectly categorized under social history sections;

(b) complete absence of actual social history information in designated social history fields;

(c) missing clinical assessment data essential for behavioral health documentation; and

(d) failure to integrate any generated content with existing patient records as represented.

35.     The AI-generated report was substantially shorter than required for behavioral health documentation standards, contained virtually no clinically useful information, and demonstrated complete inability to capture the nuanced clinical information required for psychiatric evaluation and treatment planning.

36.     NextGen representatives, visibly embarrassed by the system's failure, immediately ceased sharing the defective document during the Zoom meeting and refused to provide copies to Elite DNA for detailed review, preventing Elite DNA from documenting the specific failures for future reference.

37.     Following this demonstration disaster, Ashley DeMasi sent a follow-up email to David Dougherty on June 13, 2025, explicitly acknowledging the "gaps that were seen in the Mobile Pro AI yesterday" and proposing to "pivot to all users (psych and therapy) using Blueprint for AI" as an alternative solution, constituting written admission of the Mobile Pro AI system's fundamental inadequacy:

> **From:** Ashley DeMasi <ADeMasi@nextgen.com>
> **Sent:** Friday, June 13, 2025 11:34 AM
> **To:** David Dougherty <DavidD@elitedna.com>
> **Subject:** Provider AI Follow up
>
> Good morning, David,
>
> I wanted to reach out and provide an update. Wendy has been testing blueprint in more detail – the gaps that were seen in the Mobile Pro AI yesterday are non-existent in Blueprint. I believe it makes a lot of sense to pivot to all users (psych and therapy) using Blueprint for AI. We can absolutely demo this for just you and then the providers when the time is right.

The June 13, 2025 Email is attached hereto as Exhibit "**B**".

### Elite DNA's First Formal Notice of Breach

38.     On June 24, 2025, Elite DNA delivered a formal Notice of Material Breach to NextGen, documenting NextGen's failure to deliver functional behavioral health software and identifying specific patient safety concerns created by the defective system. The June 24, 2025, Notice is attached hereto as Exhibit "**C**".

39.     The June 24 notice specifically identified two categories of material breach:

(a) Delivery of software failing to meet the "gold standard" representations made during contract negotiations and failing to satisfy the Limited License Warranty requiring

substantial performance in accordance with User Materials; and

(b) Creation of patient safety risks through system design that prevented adequate clinical documentation and risk assessment in behavioral health practice.

40.     Elite DNA's Notice of Material Breach provided NextGen with specific examples of system deficiencies, including the inadequate template software previously demonstrated and the patient safety implications of incomplete risk documentation capabilities. The notice was served pursuant to Section 11.2 of the General Terms and Conditions, incorporated within the Master Agreement, and provided NextGen with opportunity to cure the identified breaches within thirty days.

41.     NextGen failed to cure the documented breaches during the thirty-day cure period, instead scheduling additional meetings purporting to demonstrate system improvements while continuing to demand that Elite DNA perform extensive customization work that contradicted NextGen's original "out of the box" representations.

**The July 9, 2025 Final Demonstration and Definitive Proof of System Failure**

42.     Following Elite DNA's formal breach notice, NextGen requested a demonstration for July 9, 2025, representing that they would showcase meaningful progress addressing Elite DNA's documented concerns about system functionality and patient safety implications.

43.     The July 9, 2025 meeting included Elite DNA's clinical and executive leadership: Margaret Barrow (Regional Leader), Dr. VanCamp (VP Psychiatry), Jason Moon (President), and Elizabeth Dosoretz (Founder/CEO). NextGen assembled senior executive representation including Nick Maynard (VP Behavioral Health Sales), Nicole Mitchell (VP Sales - Commercial Growth), Javier Favela (VP Integrated Care Solutions), Mitchell Waters (Chief Revenue Officer), and Wendy Coots (Nurse Practitioner, Senior Sales Application Specialist).

44.    To demonstrate their system's purported capabilities, NextGen arranged a mock patient session with Dr. VanCamp role-playing as a patient presenting typical behavioral health concerns and Wendy Coots, NextGen's own Nurse Practitioner and Senior Sales Application Specialist, demonstrating provider workflow using NextGen's software in real-time.

45.    During this demonstration, conducted before Elite DNA's clinical leadership and NextGen's senior executives, Nurse Coots proved incapable of effectively operating NextGen's own system. Specifically, Coots:

(a) Could not navigate through the software's menu structure quickly enough to maintain realistic session pacing;

(b) Repeatedly forgot to document key patient information provided during the mock session;

(c) Failed to capture critical risk assessment data; and

(d) Omitted documentation of risk factors that would be essential for patient safety in actual behavioral health practice.

46.    The July 9 demonstration revealed specific, documented failures in NextGen's system's ability to capture essential behavioral health information. During the mock session, the system failed to document:

(a) Specific patient triggers, including the example that the mock patient "gets angry specifically when there is traffic;"

(b) Relationship-based triggers, including the example that "a trigger for the patient is when their husband tells them that they are too hyper-focused on completing their task;" and

(c) Critical safety information including "the fact that a patient has a past history of suicidal ideation."

47.    These documentation failures during NextGen's own demonstration precisely exemplified the patient safety concerns that Elite DNA had repeatedly identified: NextGen's system design prevents comprehensive documentation of the specialized clinical information that behavioral health providers require to assess patient risk and provide appropriate care.

48.    The July 9 meeting represented NextGen's final opportunity to demonstrate that their software could perform as promised. Instead, the demonstration provided definitive evidence that even ***NextGen's own clinical staff***, specifically trained on their system and serving as their subject matter expert, could not safely operate the software in a realistic behavioral health workflow.

49.    One glance at the screen the health provider is supposed to use during a session makes clear why even Nurse Coots, NextGen's seasoned and trained medical provider selected by NextGen to showcase the product, could not use the system during this simulated session:



**Elite DNA's Second Notice of Material Breach**

50.    On July 11, 2025, Elite DNA delivered a Second Notice of Material Breach to NextGen, documenting the continued failures demonstrated during the July 9 meeting and

NextGen's persistent inability to deliver functional behavioral health software despite multiple opportunities for remediation. This Second Notice of Material Breach is attached hereto as Exhibit "**D**".

51.     The July 11 notice specifically documented NextGen's admission during the July 9 meeting that the software version previously provided to Elite DNA was not actually their "out of the box" behavioral health suite as originally represented, and that NextGen's proposed improvements would require additional focus groups and testing before implementation—confirming that NextGen had never possessed a functional behavioral health product ready for deployment.

52.     Elite DNA's second breach notice detailed the specific clinical information that NextGen's system failed to capture during their own demonstration, emphasizing the patient safety implications of these failures and NextGen's continued inability to provide software meeting basic behavioral health practice standards.

53.     The notice also addressed NextGen's problematic suggestion that Elite DNA consult with a reference client, Juan Gomez, noting that independent research had revealed Mr. Gomez's employer maintained a long-standing financial relationship with NextGen, creating bias concerns that rendered this reference inappropriate for Elite DNA's objective evaluation of NextGen's capabilities. Despite repeatedly asking for the names and contact information for enterprise users in the mental health sector successfully using this product, NextGen failed to do so. After all of these problems, the reason for such failure is clear.

54.     On July 23, 2025, NextGen responded to Elite DNA's breach notices through Senior Vice President and Associate General Counsel Shadi Bank, denying the existence of any material breach while simultaneously acknowledging that Elite DNA had purchased only

"standard templates" rather than the specialized behavioral health functionality originally represented during sales negotiations. Attached hereto as Exhibit "**E**".

55.    NextGen's response included that Elite DNA had an outstanding balance of $535,350.78 as of July 22, 2025, with $153,639.96 more than thirty days past-due, and threatened to accelerate Elite DNA's remaining fee obligations under the agreements, totaling approximately nine million dollars over the four-year term, making "all such amounts immediately due and payable."

56.    NextGen's acceleration threats explicitly acknowledged that "any improper termination will trigger acceleration of the remaining ~$9 million in fees plus damages," demonstrating NextGen's intent to extract the full contract value despite their fundamental failure to deliver promised functionality.

**NextGen's Premature System Lockout and Contract Repudiation**

57.    Following Elite DNA's breach notices and before any formal contract termination, NextGen unilaterally terminated Elite DNA's access to their software system, preventing further evaluation or potential remediation efforts.

58.    NextGen's premature system lockout violated the ongoing contractual relationship and demonstrated NextGen's unwillingness to cure the documented material breaches that Elite DNA had properly identified through formal legal notice.

59.    This system lockout occurred while the parties remained bound by the Master Agreement and before Elite DNA had taken action to terminate the contractual relationship, constituting NextGen's anticipatory repudiation of their contractual obligations.

60.    As a direct result of NextGen's material breaches, Elite DNA has suffered substantial monetary exposure including NextGen demanding immediate payment of additional

amounts while threatening acceleration of the remaining contract balance totaling approximately $8.5 million.

61.     Elite DNA's clinical staff was forced to divert hundreds of hours from patient care responsibilities to perform unpaid product development work that NextGen should have completed before marketing their software as a behavioral health solution. This staff time diversion represents direct, quantifiable damages based on the clinical staff's hourly compensation.

62.     The failed implementation has disrupted Elite DNA's operations across thirty-three locations, preventing the planned technological improvements and operational efficiencies that motivated the original contract and creating ongoing competitive disadvantage in the healthcare marketplace.

63.     Elite DNA allegedly remains trapped in an expensive four-year contract for software that cannot support its clinical operations, and NextGen's threats to accelerate remaining payment obligations create ongoing financial uncertainty and potential exposure totaling millions of dollars despite NextGen's complete failure to deliver contracted services.

### COUNT I: CLAIM FOR DAMAGES FOR BREACH OF CONTRACT

64.     Elite DNA incorporates by reference paragraphs 1 through 63 as if fully set forth herein.

65.     The Master Agreement executed December 23, 2024, created binding contractual obligations requiring NextGen to deliver functional behavioral health software meeting the specifications and performance standards represented during negotiations and incorporated within the contract terms, including NextGen's Limited License Warranty guaranteeing substantial performance in accordance with User Materials.

66.     NextGen materially breached the agreement by delivering primary care templates

instead of the specialized behavioral health software promised during contract negotiations, violating the fundamental consideration that induced Elite DNA's performance and depriving Elite DNA of the essential benefits it reasonably expected to receive under the contract.

67.    NextGen's software failed to perform substantially in accordance with the contractual specifications and industry standards for behavioral health practice, demonstrating fundamental non-performance that constitutes material breach excusing Elite DNA's further performance obligations.

68.    NextGen further materially breached the agreement by improperly shifting design and development responsibilities to Elite DNA's clinical staff, violating the contractual allocation of implementation duties and forcing Elite DNA to perform NextGen's obligations without additional compensation.

69.    NextGen's premature termination of Elite DNA's system access before contract repudiation constituted anticipatory breach and demonstrated unwillingness to cure the documented deficiencies that Elite DNA had properly identified through formal legal notice.

70.    NextGen's breaches go to the essence of the Master Agreement and defeat its fundamental purpose. Elite DNA contracted for a specialized behavioral health EHR system capable of supporting mental health practice workflows, but NextGen delivered generic primary care templates wholly unsuitable for behavioral health documentation and patient safety requirements.

71.    NextGen has demonstrated its inability to perform the essential obligations under the Master Agreement. Despite multiple opportunities to cure, including formal breach notices and collaborative remediation efforts, NextGen's own clinical personnel proved incapable of operating their system during the July 9, 2025 demonstration, confirming that substantial performance is

impossible.

72.     As a direct result of NextGen's material breaches, Elite DNA is excused from all future payment obligations under the Master Agreement and is entitled to damages.

73.     Elite DNA provided NextGen with proper written notice of material breach through letters dated June 24, 2025, and July 11, 2025.

74.     As a direct and proximate result of NextGen's material breaches, Elite DNA has suffered substantial damages including exposure to contractual obligations totaling approximately nine million dollars, staff time costs for performing NextGen's development obligations, and operational disruption across thirty-three locations.

**WHEREFORE**, Elite DNA respectfully requests that the Court: (a) enter judgment in favor of Elite DNA and against NextGen; (b) award Elite DNA compensatory damages in amounts to be proven at trial; (c) award pre-judgment and post-judgment interest as provided by law; and (d) grant such other and further relief as this Honorable Court deems just and proper.

## COUNT II: CLAIM FOR RESCISSION FOR BREACH OF CONTRACT

75.     Elite DNA incorporates by reference paragraphs 1 through 63 as if fully set forth herein.

76.     The Master Agreement executed December 23, 2024, created binding contractual obligations requiring NextGen to deliver functional behavioral health software meeting the specifications and performance standards represented during negotiations and incorporated within the contract terms, including NextGen's Limited License Warranty guaranteeing substantial performance in accordance with User Materials.

77.     NextGen materially breached the agreement by delivering primary care templates instead of the specialized behavioral health software promised during contract negotiations,

violating the fundamental consideration that induced Elite DNA's performance and depriving Elite DNA of the essential benefits it reasonably expected to receive under the contract.

78.    NextGen's software failed to perform substantially in accordance with the contractual specifications and industry standards for behavioral health practice, demonstrating fundamental non-performance that constitutes material breach excusing Elite DNA's further performance obligations.

79.    NextGen further materially breached the agreement by improperly shifting design and development responsibilities to Elite DNA's clinical staff, violating the contractual allocation of implementation duties and forcing Elite DNA to perform NextGen's obligations without additional compensation.

80.    NextGen's premature termination of Elite DNA's system access before contract repudiation constituted anticipatory breach and demonstrated unwillingness to cure the documented deficiencies that Elite DNA had properly identified through formal legal notice.

81.    NextGen's breaches go to the essence of the Master Agreement and defeat its fundamental purpose. Elite DNA contracted for a specialized behavioral health EHR system capable of supporting mental health practice workflows, but NextGen delivered generic primary care templates wholly unsuitable for behavioral health documentation and patient safety requirements.

82.    NextGen has demonstrated its inability to perform the essential obligations under the Master Agreement. Despite multiple opportunities to cure, including formal breach notices and collaborative remediation efforts, NextGen's own clinical personnel proved incapable of operating their system during the July 9, 2025 demonstration, confirming that substantial performance is impossible.

83.    As a direct result of NextGen's material breaches, Elite DNA is excused from all future payment obligations under the Master Agreement and is entitled to the equitable remedy of rescission of the contract with restitution of all payments made.

84.    Elite DNA provided NextGen with proper written notice of material breach and rescission through letters dated June 24, 2025, and July 11, 2025.

85.    Elite DNA is prepared to restore all benefits received under the Master Agreement, including software licenses, access credentials, training materials, and implementation services, to achieve mutual restoration of the parties to their pre-contractual positions.

86.    NextGen's material breaches have made performance of the contract impossible and have frustrated the essential purpose of the agreement, warranting rescission.

87.    Elite DNA does not have an adequate remedy at law because the defective software cannot be adequately repaired to meet clinical requirements, and monetary damages cannot compensate for the ongoing operational disruption and patient safety concerns caused by NextGen's breaches.

88.    As a direct and proximate result of NextGen's material breaches, Elite DNA has suffered substantial damages including exposure to contractual obligations totaling approximately nine million dollars, staff time costs for performing NextGen's development obligations, and operational disruption across thirty-three locations.

**WHEREFORE**, Elite DNA respectfully requests that the Court: (a) enter judgment in favor of Elite DNA and against NextGen; (b) order rescission of the Master Agreement and restitution of all payments made by Elite DNA to NextGen; (c) award pre-judgment and post-judgment interest as provided by law; and (d) grant such other and further relief as this Honorable Court deems just and proper.

## <u>COUNT III: UNJUST ENRICHMENT</u>

89.     Elite DNA incorporates by reference paragraphs 1 through 63 as if fully set forth herein.

90.     Elite DNA conferred substantial non-monetary benefits upon NextGen that fall outside the scope of the contractual relationship and exceed any damages limitations contained within the Master Agreement. These benefits were not contemplated as part of the original contractual consideration and represent value-added services that NextGen has unjustly retained.

91.     Specifically, Elite DNA's clinical leadership provided NextGen with extensive product development services including:

(a) Hundreds of hours of specialized behavioral health expertise through mandatory "build sessions" where Elite DNA's licensed clinical professionals created comprehensive workflow specifications, diagnostic protocols, and treatment templates;

(b) Proprietary clinical knowledge and methodologies developed through Elite DNA's years of behavioral health practice experience;

(c) Detailed system requirements and user specifications that transformed NextGen's generic templates into specific behavioral health applications; and

(d) Comprehensive testing and feedback services that identified critical system deficiencies and provided detailed remedial guidance.

92.     NextGen explicitly acknowledged the value of these benefits when Vice President Nick Maynard stated during project meetings that NextGen intended to utilize Elite DNA's work product as template materials for future behavioral health client implementations, effectively converting Elite DNA's clinical staff into unpaid product development consultants.

93.     NextGen had full knowledge and appreciation of these benefits as they were

provided pursuant to NextGen's specific requests and demands during the implementation process. NextGen actively solicited, received, and incorporated Elite DNA's clinical expertise into their software development efforts while representing that such work was necessary for Elite DNA's implementation rather than disclosing NextGen's intent to leverage this work for broader commercial purposes.

94.    NextGen's retention of these benefits is inequitable and unjust under the circumstances. NextGen has failed to provide the functional behavioral health software that constituted the consideration for Elite DNA's participation in the development process, yet continues to retain and utilize Elite DNA's proprietary clinical work product for NextGen's commercial benefit with other clients.

95.    The value of the services Elite DNA provided to NextGen cannot be precisely quantified through traditional contractual damage calculations, as these services involved specialized professional expertise, proprietary methodologies, and clinical knowledge that NextGen obtained without compensation. Thus, Elite DNA is entitled to restitution representing the reasonable value of these professional services based on the market rate for comparable behavioral health consulting and system development work.

**WHEREFORE**, Elite DNA respectfully requests that this Court: (a) enter judgment in favor of Elite DNA and against NextGen; (b) award Elite DNA the fair market value of clinical development services, behavioral health expertise, and proprietary methodologies unjustly retained by NextGen; (c) award pre-judgment and post-judgment interest as provided by law; and (d) grant such other relief as this Court deems just and proper.

## COUNT IV: DECLARATORY JUDGMENT

96.    Elite DNA incorporates by reference paragraphs 1 through 63 as if fully set forth herein.

97.    An actual, justiciable controversy exists between Elite DNA and NextGen regarding Elite DNA's contractual rights, specifically Elite DNA's right to terminate the Master Agreement based on NextGen's material breaches and Elite DNA's relief from future payment obligations under the contract.

98.    NextGen has threatened to enforce the contract's "binding, non-cancelable, and irrevocable" payment provisions, demanding over $500,000 in immediate payments and to accelerate approximately $8.5 million in remaining contract fees despite NextGen's fundamental failure to deliver the promised behavioral health software functionality.

99.    Elite DNA seeks judicial declaration that NextGen's material breaches excuse Elite DNA's further performance under the contract and provide legal grounds for termination without penalty, relieving Elite DNA from the remaining multi-million-dollar payment obligations that NextGen threatens to accelerate.

100.    Elite DNA seeks judicial declaration that NextGen's threats to accelerate remaining contract payments are invalid and unenforceable given NextGen's documented material breaches and fundamental failure to deliver contracted services.

101.    Elite DNA seeks judicial declaration establishing its right to recover damages caused by NextGen's breaches, including restitution of payments made for non-functional software and services, compensation for staff time diverted to perform NextGen's development obligations, and damages from operational disruption.

**WHEREFORE**, Elite DNA respectfully requests that the Court: (a) enter declaratory judgment that Elite DNA's right to terminate the Master Agreement is justified by NextGen's material breaches and that Elite DNA is relieved from all future payment obligations under the contract; (b) enter declaratory judgment that NextGen's demands for immediate payment of $500,000 and its threats to accelerate remaining contract payments totaling approximately 8.5 million dollars are invalid and unenforceable due to NextGen's material breaches; (c) enter declaratory judgment establishing Elite DNA's right to recovery of all payments made for non-functional software and services; (d) award pre-judgment and post-judgment interest as provided by law; and (e) grant such other and further relief as this Honorable Court deems just and proper.

## DEMAND FOR JURY TRIAL

Elite DNA hereby demands a trial by jury on all issues so triable pursuant to Federal Rule of Civil Procedure 38.

Dated: August 11, 2025

Respectfully submitted,

**HEISE SUAREZ MELVILLE, P.A.**
2990 Ponce De Leon Boulevard, Suite 300
Coral Gables, Florida 33134
Telephone: (305) 800-4476
Secondary E-Mails: jdelarosa@hsmpa.com;
filings@hsmpa.com

By: */s/ Mark J. Heise*
   Mark J. Heise
   Florida Bar No. 771090
   mheise@hsmpa.com
   Luis E. Suarez, Esq.
   Florida Bar No. 390021
   lsuarez@hsmpa.com

*Counsel for DNA Comprehensive Therapy Services, LLC. d/b/a Elite DNA Behavioral Health*